ARNOLD and others *v.* NATIONAL S. S. Co.[1]

(*District Court, S. D. New York.*   November 24, 1886.)

1. CARRIER — DISCHARGE OF CARGO — CUSTOMARY WHARF — DISCHARGE ELSEWHERE—LIABILITY.

The customary discharge of goods by a carrier at its own wharf, so long as no good reason for a discharge elsewhere exists, though not without occasional discharges for cause at a different wharf, imports no such strict contract obligation to discharge at its own wharf as is violated by a discharge elsewhere, for good reasons,—such as that the usual dock was full.

2. SAME—STATEMENT.

On the thirty-first of January, 1883, the dock of the National Steam-ship Company being occupied by other vessels, the steam-ship Egypt, of that line, discharged her cargo at the Inman dock, three blocks distant, where it was destroyed by fire.   Libelant alleged that the loss occurred through the violation on the part of the steam-ship company of its custom to discharge at its own wharf.   The proof showed that while it was the practice of the National line to discharge at their own dock, it was no invariable custom.   The bills of lading provided simply for a delivery at the port of New York.   The Inman Company's pier was as good and safe from fire as that of the National line, and nothing was shown in regard to the cause of the fire that especially connected it with the unloading at the Inman pier.   *Held*, that the National Company was not liable for the loss on the ground of violation of custom.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

In Admiralty.
*Evarts, Southmayd & Choate,* for libelants.
*John Chetwood* and *R. O. Benedict,* for respondent.

Brown, J. The libelants, composing the firm of Arnold, Constable & Co., filed this libel *in personam* to recover the sum of $15,000 for the loss of 36 cases of goods which had been consigned to them from England, and were brought in the steamer Egypt, landed upon the Inman Company's pier, No. 36, North river, and there destroyed by fire on the thirty-first of January, 1883. The main features of the case, including the terms of the bills of lading, bonds, permits, etc., are the same that existed in the cases of *Acker* v. *The Egypt,* in which the several libels were dismissed. 25 Fed. Rep. 320. That decision is followed here, so far as relates to the points then considered.

By the amended libel in this case it is further charged that, for many years prior to 1883, the libelants had been in the habit of shipping goods by the respondents' line, and had invariably received them at the dock owned by the respondents, and not otherwise; and that it had become an established custom and usage of the port, between the libelants and the respondents, that all the libelants' goods should be landed at the dock known as the "National Dock," which was at this time pier No. 39; that the libelants had no knowledge or notice of the landing, or intended landing, of these goods at any other dock; that the change to Pier 36 was made without necessity, and in violation of the said custom; and that it was by reason of such violation that the goods were destroyed.

Had the bills of lading provided, in express terms, that delivery should be made at Pier 39, no doubt unloading at Pier 36, without notice, would have been such a departure from the contract as to deprive the carrier of the benefit of its stipulation for the privilege of discharging "without notice, and at the consignee's risk." The custom alleged in the amended libel, in order to have a similar legal effect, must be so clearly proved, and also so certain in its character, as to have the legal effect of one of the express terms of the contract. In my judgment, the proof is entirely insufficient in either respect. I do not find more than six shipments by this line to the libelants during the five years previous; namely, one in 1878, one in 1879, none in 1880 or 1881, three in 1882, one in 1883, although this line was running from four to eight steam-ships per month. No special contract or arrangement was proved between the defendants' line and the libelants, and nothing to distinguish their relations to the defendants from their relations to any other occasional consignees. Defendants owned a dock, at which it was their habit to discharge their goods, because it was their own dock, and because it was more convenient for them to discharge there than to hire other accommodations. In agreeing with the Inman Company for freight on the Egypt for

this voyage, the defendants had contracted for the right to discharge her at their own dock, or at the Inman pier, as they might elect. Shortly before her arrival they arranged for her to go to the Inman pier, because other steamers, previously due, would so occupy their own dock that the Egypt could not be accommodated there upon arrival, nor without such delays as would be injurious both to the consignees and to the defendants' line. During the five years preceding the arrival of the Egypt, out of 192 voyages from Liverpool made by steamers of the defendants' line, in 8 instances only had the vessels been sent to docks other than those leased or controlled by the defendants.

While these facts show, undoubtedly, the habit of the defendants to discharge at their own dock, this practice was in no way legally incompatible with a lawful discharge at any other fit and appropriate wharf, whenever there was reasonable occasion for so doing. The instances of discharge elsewhere, though few, show that there was no such invariable custom. The practice of discharging at their own wharf, when there was room, does not show, or tend to show, any usage to keep vessels and consignees' goods waiting in the stream, when their wharf was full, until a place should be vacant, rather than send the vessel at once to some other proper place of discharge; nor does a mere practice of discharging at one's own wharf, of itself, raise any obligation, as a strict legal custom, to discharge at that wharf, and not elsewhere, equivalent to an express provision of the contract. If it did, consignees might refuse to accept goods at any other place, whatever the causes for a change,— such as fire, destruction, or pending repairs,—of all which the ship would take the risk. Such a construction would be manifestly unreasonable, and opposed to the interest and presumed intention of both carrier and consignee.

The bill of lading in this case stipulated only for a delivery at the port of New York. Under this provision, the defendants had a right to deliver the goods in any part of the port in which, by the usage of trade, such goods were accustomed to be delivered. *Devato* v. *Plumbago,* 20 Fed. Rep. 511, 516. Pier 36, where these goods were actually landed, was within a few hundred feet of Pier 39. It was equally convenient to the libelants, and, as appears by the evidence, it was as good and as safe from fire, as Pier 36; and it was a pier at which the libelants had been in the habit of receiving goods from the Inman Company more frequently even than from the defendants' line at Pier 39.

Doubtless, where one of the clauses of the bill of lading requires the consignee to be in readiness to receive as soon as the ship is ready to deliver, there is reason for relying upon a discharge at the particular place accustomed; and if it had appeared that there was not in this case the usual notice of the place of unloading, and that the libelants had been actually ready to receive the goods at the usual place of landing before the fire, and that the libelants' failure to re-

ceive and remove the goods arose in consequence of the change in the place of landing and the lack of the usual notice, a very different case would have been presented. The facts here are all quite the contrary. Not only was the usual notice of the place of discharge bulletined in the usual manner at the custom-house immediately upon the entry of the vessel, but the libelants were not at any time before the fire in readiness to receive the goods at either pier, because they had not time, on the thirty-first of January, to make the necessary preliminary entry in the custom-house. There is nothing shown in regard to the cause of the fire that especially connects it with the discharge at Pier 36 except the mere fact that the fire occurred there. The cause of the fire is unknown. *Railroad Co.* v. *Reeves,* 10 Wall. 176; *Hoadley* v. *Northern Transp. Co.,* 115 Mass. 304. The question presented is whether the customary discharge of goods by a carrier at its own wharf, so long as no good reason for a discharge elsewhere exists, though not without occasional discharges for cause at a different wharf, imports any strict contract obligation to discharge at its own wharf, and not elsewhere, though good reason for a discharge elsewhere does arise, for the reasonable convenience of all parties, so that the contract must be held violated by a discharge made at another place near by, equally fit and appropriate. In my judgment, there is no such obligation. As the facts, therefore, do not show any violation by the ship of the express or implied contract of the bill of lading, the libel must be dismissed, with costs.